UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

EUREKA DIVISION

|  |  |
|---|---|
| ROUND VALLEY INDIAN TRIBES, et al., | Case No. 25-cv-03736-RMI |
| Plaintiffs, | |
| v. | **ORDER GRANTING IN PART AND DENYING IN PART MOTIONS TO DISMISS FIRST AMENDED COMPLAINT** |
| MATT KENDALL, et al., | |
| Defendants. | Re: Dkt. Nos. 40, 46 |

Now pending before the court are the Motions to Dismiss Plaintiffs' first amended complaint ("FAC") by Defendant Sheriff Kendall ("Sheriff Kendall") and Defendant Mendocino County ("the County") (collectively, "Mendocino Defendants") (dkt. 40), and, separately filed, by Defendant California Highway Patrol Commissioner Sean Duryee ("Defendant Duryee") (dkt. 46). Plaintiffs have responded to both Motions to Dismiss (dkt. 48, dkt. 56), and Mendocino Defendants have replied (dkt. 53), as has Defendant Duryee (dkt. 46).

For the reasons stated below, Mendocino Defendants' Motion to Dismiss will be GRANTED IN PART and DENIED IN PART, while Defendant Duryee's Motion to Dismiss will be GRANTED IN PART and DENIED IN PART.

## BACKGROUND

*Plaintiffs' First Amended Complaint*[1]

Pursuant to Public Law 280, 42 U.S.C. § 1983, California Constitution Article I § 13, the

---

[1] By way of stipulation approved by this court in June 2025, Plaintiffs agreed to file the first amended complaint ("FAC"), which amends the initial complaint to include "specific allegations regarding unidentified California Highway Patrol officers (Doe defendants) who were allegedly involved in the execution of the search warrant at issue." (Dkt. 25 at 2.) Plaintiffs filed the FAC on July 17, 2025. (Dkt. 35.)

California Tort Claims Act ("CTCA"), the Bane Act (Cal. Civil Code § 52.1)[2], and the common law doctrine of negligence, three individuals and the Round Valley Indian Tribes ("Tribe") have sued the California counties of Humboldt and Mendocino, Sheriff Matt Kendall of the Mendocino County Sheriff's office, Sheriff William Honsal of the Humboldt County Sheriff's Office, Commissioner Sean Duryee of the California Highway Patrol ("CHP"), deputy Justin Pryor of the Humboldt County Sheriff's Office, and "DOES 1 through 50." The Tribe[3] is a named Plaintiff; the three named individual Plaintiffs are April James, Eunice Swearinger, Steve Britton ("Individual Plaintiffs"), all of whom are enrolled members of the Tribe, live on the Round Valley Indian Reservation ("Reservation"),[4] and allege that Defendants' July 2024 cannabis raids on Reservation land caused them harm.

_Summary of Facts in the FAC_

Plaintiffs allege that Defendants conducted a series of three raids on Individual Plaintiffs' properties on July 22 and 23, 2024, "without probable cause and without search warrants," which resulted in the destruction of "hundreds" of cannabis plants and other significant property damage. (FAC ¶ 37.) Plaintiff James suffers from arthritis and degenerative disc disorder—she treats the pain from these conditions with a homemade medicinal cream for which she cultivates cannabis. (FAC ¶ 39.) According to the FAC, she had two structures on her property within which she grew the cannabis for the cream. (FAC ¶ 39.) On July 22, 2024, Plaintiff James heard loud knocking and opened her door to see a handful of deputies "with their guns drawn." (FAC ¶ 40.) The deputies allegedly told Plaintiff James that they had a search warrant, but they did not present it to her before entering her home and searching for about an hour. (FAC ¶ 40.) When Plaintiff James asked why they were there, the deputies allegedly responded that they were looking for environmental violations involving river water, parole violations, and illegal cannabis cultivation,

---

[2] The Tom Bane Civil Rights Act ("the Bane Act") is codified at California Civil Code 52.1.
[3] The Round Valley Indian Tribes was formerly known as the Covelo Indian Community of the Round Valley Indian Reservation. (FAC at 2 n.1.) The Tribe is a "federally recognized Indian Tribe in Mendocino County organized under the provisions of the Act of June 18, 1934 (48 Stat. 984), commonly known as the Indian Reorganization Act ("IRA") and codified at 25 U.S.C. § 5101." (FAC ¶ 11.)
[4] Individual Plaintiffs' trust allotments were secured by Act of Congress, per the FAC. _Id._ at 4. Their allotted trust lands are within the boundaries of the Reservation. (FAC ¶ 12.)

United States District Court
Northern District of California

1  sale, and manufacturing. (FAC ¶ 40.) According to the FAC, Plaintiff James has a well on her

2  property that precludes the need for river water and no one in her family has a criminal record.

3  (FAC ¶ 40.) Before they left, the deputies plowed all the plants on Plaintiff James's property into

4  piles of soil, vegetation, metal, and plastic. (FAC ¶ 40.)

5       Plaintiff Swearinger uses cannabis ointment to treat pain from arthritis and disabling traffic

6  accident injuries. (FAC ¶ 51.) She allegedly cultivates cannabis for her personal medical use in

7  compliance with the Tribe's ordinance. (FAC ¶ 51.) On July 22, 2024, Plaintiff Swearinger

8  learned of a law enforcement raid near her property and returned home to find two sheriff's

9  vehicles and one "California Fish and Game" vehicle parked outside her gate. (FAC ¶¶ 42–43.)

10  She left to avoid approaching the vehicles and returned about 45 minutes later to see the deputies

11  leaving; one Fish and Game officer remarked on the raid to her, but no deputy presented her with a

12  warrant. (FAC ¶¶ 43–44.) Plaintiff Swearinger then entered her home and allegedly found that the

13  deputies had damaged three doors, trim, doorknobs, and locks while breaking into locked rooms

14  during their search. (FAC ¶ 45.) According to the FAC, the vegetable garden behind her house had

15  been scraped and overturned with a tractor, destroying two small cannabis plants in addition to

16  multiple fruit and vegetable plants. (FAC ¶ 46.) The same scraping had been done to her son

17  Felix's cannabis cultivation area farther back on her property, where the soil had been scraped into

18  mounds filled with dead cannabis plants and the debris from the surrounding structures. (FAC ¶

19  47.) Plaintiff Swearinger and Felix saved and replanted about ten cannabis plants. (FAC ¶ 47.)

20  Plaintiff Swearinger was at home the next day when she saw two sheriff's vehicles, three CHP

21  vehicles, and two Fish and Game trucks carrying tractors drive across her property towards the

22  cannabis cultivation site. (FAC ¶ 48.) The vehicles left about 30 minutes later, after which

23  Plaintiff Swearinger discovered that the deputies had scraped more soil and destroyed another 25

24  cannabis plants, including the ten salvaged plants. (FAC ¶ 50.) She did not approach the vehicles

25  on the second day, and no deputy presented her with a warrant. (FAC ¶ 53.)

26       On July 23, 2024, Plaintiff Britton heard that a raid was happening on his family's trust

27  allotment, and he went to the property with his son. (FAC ¶ 54.) When they arrived, they

28  encountered sheriff's deputies who allegedly said they had a search warrant for any building on

the property and ordered them to leave. (FAC ¶ 54.) No search warrant was presented. (FAC ¶ 54.) During the search, the deputies purportedly destroyed cannabis plants, cannabis cultivation structures and equipment, fencing, and an electric gate. (FAC ¶ 54.) The FAC alleges that Plaintiff Britton had the right to cultivate cannabis on the trust allotment under the Tribe's Compassionate Use Ordinance. (FAC ¶ 100.)

After the raids, Plaintiff James was presented with the search warrant apparently used in the search of her property, attached to the FAC as Exhibit F, which did not indicate that her property was on the Reservation. (FAC ¶ 57.) No criminal charges had been filed against any of the Plaintiffs when the FAC was submitted in July 2025, but Sheriff Kendall allegedly stated that Defendants were preparing criminal cases for the District Attorney's Office to consider. (FAC ¶ 61.) The Tribe was not informed about any of the searches prior to their execution. (FAC ¶ 38.) The FAC also alleges that, on July 24, 2024, after the raids, the Tribe issued a "cease-and-desist" order to Sheriff Kendall to stop the raids. (FAC ¶ 70.) The raids ended, but Mendocino Defendants then purportedly "refused to perform law enforcement services" on the Reservation in retaliation for the cease-and-desist order. (FAC ¶ 70.)

Plaintiffs further allege that Defendants "have raided tribal trust lands on the Reservation with impunity for over a decade." (FAC ¶ 64.) They support this allegation with a search warrant for another trust allotment served on a different Tribal member in 2022, and with citations to multiple press releases that describe a series of operations by Defendants targeting cannabis cultivations sites since 2021.[5] (FAC ¶¶ 63–64.) They also state that Sheriff Kendall has posted on

---

[5] *Mendocino Cannabis Crackdown Results in 11 Tons of Product, 30K Plants*, MENDOFEVER (Oct. 8, 2024) ("During the last weeks of September 2024, the Mendocino County Sheriff's Office, with the assistance of the Humboldt County Sheriff's Office, served numerous warrants at unlicensed cannabis sites in the Round Valley area. . . A total of sixteen (16) locations were targeted during the week-long operation, with the majority of locations being in the greater Covelo area and one site in the Mendocino National Forrest."); *Mendocino Sheriff Briefs Community on Round Valley Marijuana Enforcement*, MENDOFEVER (Aug. 4, 2024) ("Thanks to the previously mentioned partnerships, the Mendocino County Sheriff's Office collaborated with the Humboldt County Sheriff's Office regarding illegal cannabis being cultivated in Round Valley. . . These lands were identified as being private properties, as well as state and tribal lands. . . Let me be clear about this, we will continue to investigate these crimes and will continue to charge the violators."); *California's Cannabis Taskforce Targets Covelo Grow Sites Eradicating an Estimated $45 Million of Product*, MENDOFEVER (Sept. 2, 2023) ("During the week of Aug. 21, wildlife officers at the California Department of Fish and Wildlife (CDFW) led a Unified Cannabis Enforcement Taskforce (UCETF) operation in Covelo and the surrounding areas in Mendocino County. . . The operation targeted 29 properties,

Facebook for years about cannabis raids on the Reservation targeting the "most egregious violators" of marijuana laws and attached some of his posts, including a 2022 post discussing his collaboration with other local sheriffs on marijuana enforcement and an August 2024 post apparently discussing the raids central to the allegations. (FAC ¶ 65; FAC Ex. H.) Attached to the FAC are eight supporting exhibits, including the following: three claims forms filed by the three Individual Plaintiffs in Humboldt and Mendocino counties for the damage caused during the raids (Ex. A); the Amended Compassionate Use Ordinance of the Round Valley Indian Tribes of 2006 (Ex. B); title status reports for the three allotments allegedly raided by Defendants (Exs. C, D, E); the search warrant and affidavit presented to Plaintiff James after the search of her property (Ex. F);[6] a search warrant and property receipt, apparently relating to the 2022 search of an allotment owned by a Tribal member (Ex. G); and three public Facebook posts by Sheriff Kendall on the Mendocino Sheriff account from 2022 and 2024 describing local cannabis enforcement operations (Ex. H).

_Summary of Plaintiffs' Claims and the Pending Motions_

Plaintiffs plead seven causes of action: unlawful assertion of jurisdiction by Defendants under Public Law 280 ("First Claim") (FAC ¶¶ 84–89); unlawful interference with Plaintiff Tribe's sovereignty ("Second Claim") (FAC ¶¶ 90–94); unlawful searches and seizures under the

where officers located and eradicated over 41,000 cannabis plants, destroyed over 7,000 pounds of processed cannabis and seized 40 firearms."); Shafiq Najib, _MSCO: Unlawful marijuana farm in Covelo abolished, multiple people detained Thursday_, KRCRTV (July 30, 2021, updated August 2, 2021) ("Over 20,000 illegally cultivated marijuana plants were reportedly confiscated and multiple people were detained at the site during a major bust in Covelo on Thursday, according to the Mendocino County Sheriff's Office. . . The Mendocino County Sheriff's Office would like to recognize and thank the following participating agencies who assisted in the successful operations conducted on 07-29-2021. . . .County of Mendocino Marijuana Enforcement Team, Mendocino Major Crimes Task Force, Mendocino County Sheriff's Office Detective Bureau, Mendocino County Sheriff's Office Patrol Division, Mendocino County Code Enforcement, . . ., _California Highway Patrol_ …." (emphasis added)). All articles were accessed by the court through the Internet Archive Wayback Machine.

[6] Exhibit F to the FAC is a copy of an executed search warrant, sworn to by Humboldt County Sheriff's Office Deputy Justin Pryor, alleging probable cause to believe that the property described in the warrant can be seized as it was "used as the means of committing a felony" and "is evidence which tends to show a felony has been committed," among other violations. (FAC Ex. F, at 1.) The warrant includes as an attachment a photograph of a rural parcel containing five large greenhouses covered in plastic next to a single-family residence, and a series of authorizations, including an order to "destroy the marijuana plant/products." (FAC Ex. F., at 2–4.)

United States District Court
Northern District of California

Fourth Amendment ("Third Claim") (FAC ¶¶ 95–102); unlawful searches and seizures under the California Constitution Article I § 13 ("Fourth Claim") (FAC ¶¶ 103–106); intentional interference with Plaintiffs' constitutional rights under the Bane Act by Defendants Kendall, Honsal, and Pryor, with Defendants Mendocino and Humboldt counties vicariously liable under the CTCA ("Fifth Claim") (FAC ¶¶ 107–111); negligence by Defendants Kendall, Honsal, and Pryor, and Defendants Mendocino and Humboldt counties vicariously liable ("Sixth Claim") (FAC ¶¶ 112–119); and violation of Plaintiffs' Fourteenth Amendment equal protection rights against selective enforcement by Mendocino Defendants and Does 1–50 ("Seventh Claim") (FAC ¶¶ 120–127).

By way of remedy, Plaintiffs seek "declaratory and injunctive relief against Defendants preventing them from enforcing State cannabis laws against Plaintiffs while engaging in cannabis activities on the Reservation and requiring that Defendant Kendall and Mendocino County enforce State criminal law and serve and protect Indians on the Reservation"; an award of compensatory and punitive damages against all Defendants for the violations of federal and state law; an award of compensatory damages against Defendants Mendocino County and Humboldt County under the CTCA; an award of prejudgment interest on any award of damages to the extent permitted by law; and an award of "reasonable attorneys' fees, costs and disbursements" pursuant to state and federal law. (FAC at 28.)

Mendocino Defendants filed the pending Motion to Dismiss pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6), asserting lack of subject matter jurisdiction and challenging the sufficiency of the allegations set forth in the FAC. (Dkt. 40.) Defendant Duryee also moves to dismiss the FAC pursuant to Rules 12(b)(1) and 12(b)(6). (Dkt. 46.) Defendant Duryee argues that the FAC must be dismissed for lack of standing, ripeness, and Eleventh Amendment immunity, and because Plaintiffs fail to state a claim for relief against him. (Dkt. 46 at 9–11.)

## LEGAL STANDARDS

When evaluating 12(b)(1) challenges to the court's subject-matter jurisdiction, it should be noted that plaintiffs bear the burden of proving jurisdiction at the time the action is commenced. *See Tosco Corp. v. Cmtys. for Better Env't*, 236 F.3d 495, 499 (9th Cir. 2001), *overruled on other*

United States District Court
Northern District of California

*grounds by Hertz Corp. v. Friend*, 559 U.S. 77, 96–97 (2010); *see also Kingman Reef Atoll Invs., LLC v. United States*, 541 F.3d 1189, 1197 (9th Cir. 2008). Challenges to standing are properly brought through a Rule 12(b)(1) motion to dismiss. *Chandler v. State Farm Mut. Auto. Ins. Co.*, 598 F.3d 1115, 1122 (9th Cir. 2010) ("Because standing and ripeness pertain to federal courts' subject matter jurisdiction, they are properly raised in a Rule 12(b)(1) motion to dismiss."). "A Rule 12(b)(1) jurisdictional attack may be facial or factual." *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). A facial attack "asserts that the allegations contained in the complaint are insufficient on their face to invoke federal jurisdiction." *Id*. When considering this type of challenge, courts are required to "accept as true the allegations of the complaint." *See United States ex rel. Lujan v. Hughes Aircraft Co.*, 243 F.3d 1181, 1189 (9th Cir. 2001); *see also Miranda v. Reno*, 238 F.3d 1156, 1157 n.1 (9th Cir. 2001). On the other hand, in a factual attack, "the challenger disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction." *Safe Air*, 373 F.3d at 1039. In resolving a factual attack on jurisdiction, courts need not presume the truthfulness of the plaintiff's allegations and may review evidence beyond the complaint without converting the motion to dismiss into a motion for summary judgment. *See id.*; *see also White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000).

In reviewing the sufficiency of a complaint in light of a request to dismiss under Rule 12(b)(6), before the presentation of any evidence either by affidavit or admissions, the court's task is limited—the issue is not whether a plaintiff will ultimately prevail, but rather whether a plaintiff is even entitled to offer evidence to support the claims. *See Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974); *see also Gilligan v. Jamco Dev. Corp.*, 108 F.3d 246, 249 (9th Cir. 1997). Dismissal is proper when an operative complaint either fails to advance "a cognizable legal theory," or fails to include "sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990); *see also Graehling v. Village of Lombard*, 58 F.3d 295, 297 (7th Cir. 1995).

To survive dismissal under the standards associated with Rule 12(b)(6), complaints must contain enough relevant factual allegations to establish the grounds for a plaintiff's entitlement to relief—doing so "requires more than labels and conclusions, and a formulaic recitation of the

United States District Court
Northern District of California

1    elements of a cause of action . . . ." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "Nor

2    does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'"

3    *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp.*, 550 U.S. at 557). Under these

4    standards, courts follow a "two-prong approach" for addressing a motion to dismiss: (1) the court

5    must accept as true all of the allegations contained in a complaint except for legal conclusions,

6    threadbare recitals of the elements of a cause of action, or conclusory statements; and (2) only a

7    complaint that states a *plausible* claim for relief survives a motion to dismiss. Plausibility is a

8    context-specific task that requires the reviewing court to draw on its judicial experience and

9    common sense; however, where the well-pleaded facts do not permit the court to infer more than

10   the mere *possibility* of misconduct, the complaint may have alleged, but it has failed to "show,"

11   "that the pleader is entitled to relief" as required by Rule 8(a)(2). *See generally Iqbal*, 556 U.S. at

12   678–79. In short, for a complaint to survive a Rule 12(b)(6) motion to dismiss, the non-conclusory

13   factual content and the reasonable inferences from that content must plausibly suggest a claim

14   entitling the plaintiff to relief. *See Moss v. U.S. Secret Serv.*, 572 F.3d 962, 970 (9th Cir. 2009).

15       As to the nature of dismissals, leave to amend should be granted unless it is clear that

16   amendment would be futile because further amendments cannot remedy the defects in the

17   complaint. *See Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1051 (9th Cir. 2008) ("Dismissal

18   without leave to amend is proper if it is clear that the complaint could not be saved by

19   amendment."); *see also Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 946 (9th

20   Cir. 2005); *California ex rel. Cal. Dep't of Toxic Substances Control v. Neville Chem. Co.*, 358

21   F.3d 661, 673 (9th Cir. 2004) ("[D]enial of leave to amend is appropriate if the amendment would

22   be futile.") (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

23   **JURISDICTION UNDER PUBLIC LAW 280 AND TRIBAL SOVEREIGNTY**

24       The first cause of action in the FAC requests declaratory and injunctive relief on the

25   grounds that Defendants cannot enforce California's marijuana laws against Plaintiffs on the

26   Reservation because they do not have jurisdiction under Public Law 280. It specifically seeks "an

27   order declaring that the Defendants have no authority or jurisdiction to search, seize and destroy

28   Individual Plaintiffs' property for alleged violations of the H & S Code by Individual Plaintiffs

and other Indians on the Reservation" and an injunction preventing Defendants from "searching and destroying the Individual Plaintiffs' and other Indians' property on the Reservation for violations of the H & S Code." (FAC ¶¶ 87–88.) The second cause of action also requests similar injunctive relief enjoining Defendants from "enforcing the provisions of the H & S Code" against Indians on the Reservation, as this enforcement unlawfully interferes with the Tribe's sovereignty by "preventing the Tribe from determining to what extent and under what conditions, if any, tribal members will be able to cultivate, possess and use cannabis on the Reservation."[7] (FAC ¶¶ 90–94.) Mendocino Defendants move to dismiss both causes of action in their entirety.

When the conduct of Indians on Indian country is at issue, tribal sovereignty is subordinate only to federal law and is generally not subject to state law unless Congress has expressly provided the state with such jurisdiction. *California v. Cabazon Band of Mission Indians*, 480 U.S. 202, 207 (1987), *superseded by statute on other grounds*; *see also Chicken Ranch Rancheria of Me-Wuk Indians v. California*, 42 F.4th 1024, 1031 (9th Cir. 2022) ("State laws generally are not applicable to tribal Indians on an Indian reservation except where Congress has expressly provided

---

[7] As an aside, the court notes that the requests for injunctive and declaratory relief are overly broad and, as worded, could not be granted based on the facts alleged in the FAC. Plaintiffs ask the court to declare that Defendants have no jurisdiction to enforce "the provisions" of the California Health and Safety Code on the Reservation or to conduct searches based on violations of the Health and Safety Code. These requests do not limit the injunction to any specific sections of the Health and Safety Code or even generally refer to the Cannabis Division of the code, which is far too broad—the Ninth Circuit has specifically found that some provisions of the California Health and Safety Code *are* enforceable on Indian reservations. *See Quechan Indian Tribe v. McMullen*, 984 F.2d 304, 308 (9th Cir. 1993) (holding that the fireworks laws at California Health and Safety Code §§ 12500 *et seq.* are enforceable on reservations). The Prayer for Relief attempts to mitigate this by asking the court to do the following: "Issue declaratory and injunctive relief against the Defendants preventing them from enforcing State cannabis laws against Plaintiffs while engaging in cannabis activities on the Reservation and requiring that Defendant Kendall and Mendocino County enforce State criminal law and serve and protect Indians on the Reservation." (FAC at 28.) But this request is contradictory, as some provisions of "State cannabis laws" are indisputably criminal—for example, the prohibition on selling or giving cannabis to minors. *See United States v. Dotson*, 615 F.3d 1162, 1169 (9th Cir. 2010) (finding law prohibiting the furnishing of alcohol to minors to be criminal and thus enforceable on reservations under the Assimilative Crimes Act). Under a 12(b) motion to dismiss, courts may consider such questions as whether requested damages are barred as a matter of law or whether plaintiffs have standing to request injunctive relief—at this stage, however, courts rarely dismiss a claim on the basis that the requested relief is inappropriate because prayers for relief are not themselves causes of action. *See United States v. Maricopa Cnty.*, 915 F. Supp. 2d 1073, 1082 (D. Ariz. 2012) (denying request to dismiss portion of complaint requesting injunctive relief because "[a] 12(b)(6) motion to dismiss challenges the legal sufficiency of the pleadings, not the appropriateness of the relief sought."). As such, the court moves to the substance of the First and Second Claims despite the inoperable injunction requests.

United States District Court
Northern District of California

that State laws shall apply." (quoting *McClanahan v. State Tax Comm'n of Ariz.*, 411 U.S. 164, 170–71 (1973))); *Big Sandy Rancheria Enters. v. Bonta*, 1 F.4th 710, 725 (9th Cir. 2021) (state regulatory law is generally inapplicable to the conduct of Indians on reservations). The relevant federal law conferring jurisdiction in this case is known as Public Law 280 ("PL 280"), which grants the State of California broad powers over criminal matters and limited powers over civil matters involving on-reservation conduct by Indians. 18 U.S.C. § 1162(a); 28 U.S.C. § 1360.[8] In defining the scope of those limited civil matters, the Supreme Court has held that Congress did not "confer upon the States general civil regulatory powers."[9] *Bryan v. Itasca Cnty.*, 426 U.S. 373, 385–390 (1976). Thus, in deciding whether a state law may be enforced pursuant to the jurisdiction granted by PL 280, the relevant question is whether the state law at issue is "criminal/prohibitory" or "civil/regulatory" in nature. *Cabazon*, 480 U.S. at 208–210.

There is no bright-line rule for distinguishing between criminal and regulatory statutes; "[t]he shorthand test is whether the conduct at issue violates the State's public policy." *Confederated Tribes of Colville Rsrv. v. State of Wash.*, 938 F.2d 146, 147 (9th Cir. 1991)

---

[8] The criminal provision reads as follows with respect to California:

> [California] shall have jurisdiction over offenses committed by or against Indians in [all Indian country within the State] to the same extent that [California] has jurisdiction over offenses committed elsewhere within [California], and the criminal laws of [California] shall have the same force and effect within such Indian country as they have elsewhere within [California].

18 U.S.C. § 1162(a) (substituting the California-specific elements of the table into the general language that also applies to five other states). The civil jurisdiction grant reads as follows:

> [California] shall have jurisdiction over civil causes of action between Indians or to which Indians are parties which arise in [all Indian country within the State] to the same extent that [California] has jurisdiction over other civil causes of action, and those civil laws of [California] that are of general application to private persons or private property shall have the same force and effect within such Indian country as they have elsewhere within the State.

28 U.S.C. § 1360(a) (substituting the California specific elements of the table into the general language that also applies to five other states).

[9] The Supreme Court in *Bryan* also held that Congress intended "to grant [States] jurisdiction over private civil litigation." 426 U.S. 373, 385 (1976); *see also Confederated Tribes of Colville Rsrv. v. State of Wash.*, 938 F.2d 146, 147 (9th Cir. 1991) (limited state civil jurisdiction conferred by PL 280 was intended "essentially to afford Indians a forum to settle private disputes among themselves."). No party contends that the laws at issue in this case might fall into this category of private civil litigation.

1  (quoting *Cabazon*, 480 U.S. at 209); *Quechan Indian Tribe v. McMullen*, 984 F.2d 304, 307 (9th

2  Cir. 1993) (holding that the proper inquiry is "one of the statute's intent and not simply its label").

3  In most cases, a law whose intent is "generally to prohibit certain conduct" is criminal/prohibitory,

4  *Quechan*, 984 F.2d at 306 (quoting *Cabazon*, 480 U.S. at 209), while a law which generally

5  permits certain conduct subject to regulation is more likely to be civil/regulatory. *Colville*, 938

6  F.2d at 147–48.

7      Mendocino Defendants argue that any claims based on alleged lack of jurisdiction under

8  PL 280 to enforce marijuana laws on the Reservation should be dismissed as a matter of law

9  because the marijuana regulations at issue in this case are criminal in nature. (Mot. Dismiss, Dkt.

10  40, at 5–15.) Plaintiffs argue that Mendocino Defendants mischaracterize marijuana law in

11  California and the scope of the laws at issue here, and that California marijuana law is regulatory

12  in nature rather than criminal in nature.[10] (Pl.'s Resp., Dkt. 48, at 4–9.)

13      Plaintiffs and Defendants generally rely on the same cases analyzing jurisdiction under PL

14  280 to reach opposite conclusions. The essential difference is the characterization of the conduct at

15  issue and California's public policy with regard to that conduct. Defendants argue that, while

16  some cannabis-related conduct is regulated by state law, "large-scale marijuana cultivation"—the

17  conduct they contend is at issue here—"is and has always been criminally prohibited." (Def.'s

18  Mot., Dkt. 40, at 16.) Defendants first rely on the Ninth Circuit's opinions in *Dotson* and *Clark* to

19  argue that the focus should be on the specific statute at issue rather than the overarching legal

20  scheme, which in this case requires focusing on those statutes governing the cultivation of

21  cannabis. *United States v. Dotson*, 615 F.3d 1162 (9th Cir. 2010) (holding that a penal provision

22  under a regulatory scheme may be properly assimilated under the Assimilated Crimes Act

23  ("ACA") where the provision was both criminal and prohibitory and applying this analysis to

24  assimilate the California law penalizing the furnishing of alcohol to minors); *United States v.*

25  *Clark*, 195 F.3d 446 (9th Cir. 1999) (finding that a state law prohibiting the practice of law

26  without a license could be assimilated under the ACA because it was both criminal and

27

28  ---
    [10] Throughout this Order, the court uses "marijuana" and "cannabis" interchangeably to refer to the definition of cannabis contained in California Health and Safety Code § 11018.

*United States District Court*
*Northern District of California*

prohibitory). Defendants then favorably compare Plaintiffs' case to *Marcyes* and *Quechan*, the latter of which led the Ninth Circuit to analyze the public policy of California and to conclude that, although the state regulated the sale of fireworks through a comprehensive licensing scheme, the purpose was to generally prohibit fireworks in order to protect public safety, and thus the fireworks laws were properly enforced on the reservation. *United States v. Marcyes*, 557 F.2d 1361, 1364 (9th Cir. 1977) (holding that the fireworks laws were applicable on the reservation because "the purpose of the fireworks laws is not to generate income, but rather to prohibit their general use and possession"); *Quechan*, 984 F.2d at 307 (finding that California could enforce its fireworks laws under PL 280 because "the intent of the statute is to generally prohibit the sale of fireworks with [a] limited exception" despite the existence of a licensing scheme). Finally, Defendants point to a number of state criminal cases concerning a variety of cannabis-related conduct after the legalization of adult use of marijuana to argue that the new laws decriminalized certain marijuana-related offenses while purposefully prohibiting and maintaining criminal penalties for other conduct, including the large-scale cultivation and possession of marijuana.

Plaintiffs, on the other hand, argue that the wide-ranging scheme in California for licensing and taxing marijuana cultivation and distribution establishes that cannabis cultivation is not against California's public policy but is instead merely subject to regulation. Plaintiffs distinguish the laws at issue in this case with the laws analyzed under *Dotson* and *Clark* by arguing that those laws involved per se prohibitions on conduct with no legal analog, while the laws here both allow limited personal cultivation and possession while also creating a legal analog in the form of licensed large-scale cultivation. They also distinguish *Marcyes* and *Quechan* by arguing that marijuana cultivation is broadly permitted and that the state derives significant revenue from the licensing and taxing of the marijuana market. Plaintiffs analogize this case to *Colville*, in which the Ninth Circuit held that speeding offenses were not criminal under PL 280 after the Washington legislature had decriminalized these offenses and stripped them of criminal procedures and protections, 938 F.2d at 148—in Plaintiffs' view, "[a] state that affirmatively licenses, taxes, and regulates an activity has, by definition, adopted a permissive policy; its cannabis laws are civil-regulatory." (Pl.'s Resp., Dkt. 48, at 7.) Finally, they argue that state law criminal cases have

United States District Court
Northern District of California

no bearing on the nature of the law under PL 280 because such cases presume legitimate criminal jurisdiction, and that any ambiguities in the statute must be resolved in favor of the Tribe. (*Id.* at 7–11.)

*Defining the Conduct and Laws at Issue*

The threshold question is the definition and scope of the conduct at issue in this case. The answer to this question is consequential; the wide variety in outcomes across cases analyzing the regulatory/prohibitory distinction "tends to result from how courts characterize the scope of the conduct at issue." *Doe v. Mann*, 415 F.3d 1038, 1954 (9th Cir. 2005). In *Cabazon*, the Supreme Court rejected the state defendants' framing of the conduct as "high stakes, unregulated" bingo and instead examined state laws pertaining to gambling in general and bingo in particular, finding that the criminal penalties attached to "high stakes, unregulated" bingo did not convert "an otherwise regulatory law" into a criminal law enforceable under PL 280. *Cabazon*, 480 U.S. at 211. The Court then held that California "regulates rather than prohibits gambling in general and bingo in particular." *Id.* The Ninth Circuit applied this analysis in *Colville* to decide whether state speeding laws could be enforced on Indian reservations. *Colville*, 938 F.3d at 148–49. There, the court found that the *Cabazon* inquiry is "whether the prohibited activity is a small subset or facet of a larger, permitted activity . . . or whether all but a small subset of a basic activity is prohibited." *Id.* at 149. Using *Marcyes* as an example of how this test should be implemented, the court held that speeding—the prohibited activity—was merely an extension of the broadly regulated activity of driving, and thus that speeding laws were regulatory and could not be enforced on the reservation. *Id.* at 149.

The first step in conducting this analysis is to determine the laws at issue in this case. Although Plaintiffs routinely reference "California's cannabis laws" and discuss cannabis regulation in broad terms, identifying the specific statutory provisions at issue is necessary because some of the cannabis code is very likely criminal in nature—for example, the prohibition on selling or giving cannabis to minors mirrors the provision in *Dotson* that was deemed criminal by the Ninth Circuit, 615 F.3d at 1168–69—while other provisions appear much more regulatory. There have been no charges filed against Plaintiffs and no discovery, so it is not immediately

13

obvious which laws Defendants sought to enforce on the Reservation; the specific statutory provisions at issue must therefore be gleaned from the conduct central to the allegations and the attachments to the FAC. The FAC references statutes pertaining to cannabis cultivation, possession, and use by adults, and medicinal exceptions to limitations on such activities, specifically through stating that the Tribe's Compassionate Use Ordinance conflicts with state law, (FAC ¶ 30), and describing Health and Safety Code §§ 11362.5 and 11358 (governing cannabis cultivation, possession, and use) as regulatory rather than criminal, (FAC ¶¶ 35–36). However, the allegations concerning the raids themselves are focused on cannabis cultivation and medical use exceptions: the FAC mentions that two of the Individual Plaintiffs use cannabis medicinally, (FAC ¶¶ 39, 51); it discusses the destruction of "hundreds" of cannabis plants during the raids, (FAC ¶ 37); it states that at least one of the Individual Plaintiffs was not cultivating for sale or distribution, (FAC ¶ 51); it alleges that all three Individual Plaintiffs "had the right to cultivate cannabis" under the Tribe's Compassionate Use Ordinance, (FAC ¶ 100); it alleges that deputies told Plaintiff James that "growing cannabis is illegal and that they could charge her with the sale and manufacturing of illegal drugs," (FAC ¶ 40); and it describes the intentional destruction of growing cannabis plants and cultivation equipment by Defendants or Defendants' agents in all three searches, (FAC ¶¶ 39–40, 46–47, 50, 54).

The FAC also includes one search warrant that was presented to Plaintiff James sometime after the search of her property, which specifies that probable cause for search and seizure existed pursuant to Penal Code §§ 1524, 1528(a), and 1536,[11] and references Health and Safety Code §§ 11470, 11472, and 11488. In addition, the warrant requests that the property be inspected for violations of a number of other codes pertaining to marijuana regulation, provides aerial pictures of greenhouses on the property, and describes the "removal" of 580 growing marijuana plants.

---

[11] These three Penal Code sections referenced in the search warrant describe the necessary procedure for properly obtaining and executing search warrants, and they are unhelpful for identifying the specific basis on which the search warrant was obtained. Cal. Penal Code § 1524 (listing the grounds on which a search warrant may be issued, including when property was or will be used in the commission of a felony or public offense); Cal. Penal Code § 1528(a) (if a magistrate is satisfied with the grounds for a search warrant, they must issue the warrant to a peace officer with their signature); Cal. Penal Code § 1536 ("All property or things taken on a warrant must be retained by the officer in his custody").

(FAC Ex. F, at 1, 5–6, 9.) The Health and Safety Codes referenced in the warrant do not specify which sections officials suspected Plaintiff James had violated: § 11470 lists the property subject to forfeiture when such property is associated with violations of the Controlled Substances Act division (which includes all cannabis-specific provisions), § 11472 allows peace officers to obtain a search warrant to seize any controlled substances possessed in violation of the controlled substances division, and § 11488 allows peace officers to seize property specified in § 11470 when making or attempting to make an arrest under a list of sections, including § 11359 and § 11360 of the cannabis subdivision. Sections 11359 and 11360 concern possession of cannabis for sale and the transport for sale, sale, furnishing, administering, and giving away of cannabis, respectively. Based on these code sections, the greenhouse photos, and the receipt for removed property, the warrant appears to be concerned with the cultivation and possible sale of cannabis.

Taken together, while the particular code sections Defendants attempted to enforce are not explicit, the information in the FAC and attached documents demonstrates that the relevant conduct in this case is the cultivation and possession for sale of cannabis, as well as cannabis cultivation and use for medicinal reasons under the compassionate use exemptions. The code sections directly regulating this conduct by unlicensed individuals are Health and Safety Code § 11362.1 (defining legal cannabis use, possession, and cultivation), § 11358 (setting forth the penalties for unlawful cannabis cultivation), § 11359 (setting forth the penalties for possession of cannabis for sale), and § 11362.5 (Compassionate Use Act).

*Public Policy and Statutory Intent*

Having determined the conduct and statutes at issue, the court next examines the public policy of California and the intent of the cannabis-related Health and Safety Codes.[12] The current

---

[12] The laws governing cannabis-related conduct are widely distributed throughout California's codes, including include the Penal Code, the Education Code (e.g. covering use of medicinal marijuana in schools), the Civil Code (e.g. covering contracts involving marijuana), the Revenue and Taxation Code (e.g. covering cannabis excise taxes), and the Government Code (e.g. covering employment decisions related to prior cannabis use), to name a few. The Adult Use of Marijuana Act ("AUMA") alone added or altered code sections in the Health and Safety Code, the Business and Professions Code, the Labor Code, the Water Code, the Revenue and Taxation Code, and the Food and Agricultural Code. Plaintiffs argue that the totality of these code sections establish a generally permissive public policy towards cannabis in California. While it is relevant that these code changes together were intended to "establish a comprehensive system to legalize, control and regulate the cultivation, processing, manufacture, distribution, testing, and sale of nonmedical

United States District Court
Northern District of California

1    Health and Safety Codes pertaining to cannabis were enacted by voters through Proposition 64 as

2    the Control, Regulate, and Tax Adult Use of Marijuana Act ("AUMA" or "the Act") in 2016.[13]

3    Section 2 of the Prop 64 text, "Findings and Declarations," states that the Act "will legalize

4    marijuana for those over 21 years old, protect children, and establish laws to regulate marijuana

5    cultivation, distribution, sale and use, and will protect Californians and the environment from

6    potential dangers"; it also clarifies that legalizing marijuana will reduce court workloads "but

7    continue to allow prosecutors to charge the most serious marijuana-related offenses as felonies,

8    while reducing the penalties for minor marijuana-related offenses as set forth in the Act." Control,

9    Regulate and Tax Adult Use of Marijuana Act, Initiative No. 15-0103, Section 2(A), (G) *as*

10   *amended* (Dec. 7, 2015) (presented to and ratified by voters as Prop. 64 in general election of Nov.

11   8, 2016). Section 3 of the AUMA, "Purpose and Intent," contains a number of intended outcomes,

12   including preventing illegal production of marijuana, "strictly control[ling]" nonmedical marijuana

13   cultivation through regulation and enforcement, allowing adults to possess and cultivate marijuana

14   "within defined limits," and "tak[ing] nonmedical marijuana production and sales out of the hands

15   _____

16   marijuana, including marijuana products, for use by adults 21 years and older, and to tax the commercial
     growth and retail sale of marijuana," the AUMA has many stated purposes and not all of its code changes

17   are at issue in this case. It is important to determine the public policy of the state related to the specific
     conduct at issue. *See Dotson*, 615 F.3d at 1168–69 (analyzing the regulatory/prohibitory distinction under

18   the ACA and rejecting the argument under *Cabazon* that the broader regulatory scheme governing alcohol
     rendered the prohibition on furnishing alcohol to minors a regulatory law). The court thus focuses this

19   analysis on the Health and Safety Code.

20   [13] The AUMA changed many code sections, with the most significant number of additions made to the
     Business and Professions Code. The current Business and Professions Codes §§ 26000–24325 regulating

21   commercial nonmedical marijuana were integrated with the AUMA in 2017 and implemented as part of the
     Medicinal and Adult-Use Cannabis Regulation and Safety Act ("MAUCRSA"). The purpose of MAUCRSA

22   was "to establish a comprehensive system to control and regulate the cultivation, distribution, transport,
     storage, manufacturing, processing, and sale" of both medicinal and recreational adult-use cannabis. Cal.

23   Bus. & Prof. Code § 26000(b). These code sections create a comprehensive licensing and regulatory scheme
     for businesses growing and selling cannabis in California and lay out a series of administrative and civil

24   penalties for failure to adhere to the regulations, although the statute does not limit the enforcement of
     additional penalties for unlicensed activities found elsewhere in the codes. Cal. Bus. & Prof. Code § 26038(e)

25   ("Notwithstanding subdivision (a) [setting civil fines], criminal penalties shall continue to apply to an
     unlicensed person engaging in commercial cannabis activity in violation of this division."); Cal. Bus. & Prof.

26   Code § 26036 ("Nothing in this division shall be interpreted to supersede or limit the department or other
     state and local agencies from exercising their existing enforcement authority, including . . . [under] the Health

27   and Safety Code [and] the Penal Code. . ."). The court does not focus on the Business and Professions Code
     because no party has alleged that any plaintiff was or intended to be conducting commercial cannabis activity

28   under these sections or that any defendant intended to enforce these code provisions through the alleged
     searches.

16

1    of the illegal market and bring[ing] them under a regulatory structure that prevents access by

2    minors and protects public safety, public health, and the environment." *Id.* at Section 3(a)–(z).

3         The AUMA identified that it was not only important to create a legal and regulated market

4    for marijuana, but that it was separately important to eliminate the illegal cultivation and

5    production of marijuana. Eliminating this illegal market was an important stated goal not only for

6    regulatory reasons like consumer safety and environmental protection, but also because the

7    existence of the illegal market "benefits violent drug cartels and transnational gangs . . .

8    jeopardizing public safety." *Id.* at Section 2(H). In the furtherance of these goals, the AUMA

9    reduced, but did not eliminate, the criminal penalties for most marijuana offenses, including felony

10   penalties for recidivism and other aggravating factors associated with unlawful cultivation and

11   possession for sale.[14] Moreover, the Act recognized the unique dangers of marijuana and the

12   importance of discouraging "use by minors and abuse by adults," and it did not remove cannabis

13   from the list of Schedule I drugs in California. *Id.* at Section 3(s).

14        Given this background, the court finds that public policy in California is not generally in

15   favor of cannabis production—it strictly limits and generally prohibits the large-scale cultivation

16   and possession for sale of cannabis. Although California created a legal market for cannabis, the

17   intent was, at least in part, to protect public safety through eradicating the illegal market. This goal

18   was achieved in part through the retention of more severe criminal penalties for those offenses

19   involving large-scale cultivation and possession-for-sale of cannabis. In particular, the AUMA

20   draws a distinction between personal use, which was decriminalized, and other marijuana-related

---

[14] An adult over 21 may be subject to felony sentencing for marijuana cultivation if they have two or more prior convictions for unlawful cultivation, if they have one or more prior convictions for crimes specified in Penal Code § 667(a)(2)(C) or § 290(c), or if the unlawful cultivation resulted in additional violations of a variety of environmental codes or otherwise caused substantial environmental harm. Cal. Health & Saf. Code § 11358(d). An adult over 21 may be subject to felony sentencing for possession of cannabis for sale if they have two or more prior convictions for possession of cannabis for sale, if they have one or more prior convictions for crimes specified in Penal Code § 667(a)(2)(C) or § 290(c), if the possession for sale involved the knowing sale or attempted sale of cannabis to a person under 18 years of age, or if the possession for sale involved knowingly hiring, employing, or using a person under 21 years old for any part of the operation. Cal. Health & Saf. Code § 11359(c)–(d). In contrast, violations of the limitations on where cannabis may be smoked or ingested are only punishable by infraction; the exceptions are smoking or ingesting cannabis on school or day care grounds while youth are present, which is punishable by misdemeanor as described in § 11357(c)–(d), and operating a vehicle while smoking or ingesting marijuana. Cal. Health & Saf. Code § 11362.4(a)–(c).

United States District Court
Northern District of California

1     conduct, which was not. This is similar to the distinction recognized by the Ninth Circuit in

2     *Colville*, wherein Washington had amended its traffic laws and "carefully distinguished those

3     offenses like speeding, which henceforth are subject to only civil penalties, from a long list of

4     offenses like reckless driving or driving while intoxicated, which remain criminal." *Colville*, 938

5     F.2d at 148. Here, the statute decriminalized marijuana use by adults—nearly all violations for

6     restrictions on use were made punishable by infraction only—while intentionally keeping more

7     severe criminal penalties for unlawful cultivation and possession for sale.

8            Plaintiffs' contention that cannabis has been broadly legalized and subject to regulation

9     such that any criminal penalties are the exception and meant to enforce regulatory provisions

10    overstates the AUMA's impact. The underlying laws that set the foundation for California's

11    licensing scheme are criminal provisions. As explained above, criminal penalties were left in place

12    for most cannabis offenses, and cannabis remains a Schedule I drug in California. This criminal

13    legal framework is the background to all marijuana-related conduct in California. The exceptions

14    to these criminal statutes are extremely limited. Adults may only cultivate up to six marijuana

15    plants subject to a variety of restrictions and regulations, and may not possess any cannabis for

16    sale, without a valid license. Moreover, the Health and Safety Codes do not penalize "unlicensed"

17    cannabis cultivation or possession-for-sale on their face; instead, they broadly criminalize all

18    possession-for-sale and almost all cultivation. Licenses are thus heavily-regulated exceptions to

19    the broader scheme of criminalization, not the other way around. In addition, license fees are

20    intended to cover the cost of administering the new regulations pertaining to marijuana businesses,

21    not to raise revenue for the state. Cal. Bus. & Prof. Code § 26180 ("The licensure and renewal fee

22    shall be calculated to cover the costs of administering this division."); *see Quechan*, 984 F.2d at

23    307 (finding fireworks law to be criminal because sale of fireworks was narrowly limited, licenses

24    were intended to cover cost of administering and enforcing fireworks law, and criminal penalties

25    were not removed). Finally, while state law is not controlling, it is persuasive that multiple

26    California courts have found that Proposition 64 was not intended to (and did not) remove

27    marijuana-related conduct from the criminal realm altogether. *See, e.g.*, *People v. Herrera*, 267

28    Cal. Rptr. 3d 95, 100–01 (Cal. Ct. App. 2020) ("after the passage of Proposition 64, possession

and use of cannabis is legal in some circumstances but not legal in other circumstances" and "cannabis remains a controlled substance listed in Schedule I"); *People v. Lin*, 236 Cal. Rptr. 3d 818, 823 (Cal. App. Dep't Super. Ct. 2018) ("With respect to the charges in the amended complaint (violations of sections 11359(b) [possession for sale] and 11358(c) [cultivation]) the penalty changed but the crime itself did not").

The relevant distinction is not possession and cultivation versus large-scale cultivation, as the parties contend, but between personal use and broader cultivation and sale. While the AUMA specifically decriminalized cannabis consumption and use—instead subjecting that use to limited regulation—it did not broadly legalize other cannabis-related conduct, including cultivation and possession-for-sale. California's public policy is concerned with eliminating illegal marijuana not just because it diverts licensing fees away from the state, but because the state has found that illegal marijuana cultivation and distribution is dangerous in its own right and must be eradicated. While there is no perfect analog to this case, California's marijuana laws and policy are much more similar to those laws that have been found to be criminal/prohibitory in nature rather than those found to be regulatory in nature. *Compare Dotson*, 615 F.3d at 1169 (furnishing alcohol to minors is criminal); *Clark*, 195 F.3d at 450 (unlicensed practice of law is criminal); *Marcyes*, 557 F.2d at 1364 (fireworks laws are criminal); *Quechan*, 984 F.2d at 307 (fireworks laws, even in presence of licensing scheme, are criminal); *St. Germaine v. Cir. Ct. for Vilas Cnty.*, 938 F.2d 75, 77 (7th Cir. 1991) (driving without a license is criminal); *Cordova v. Mendocino Cnty. Sheriff's Off.*, No. 23-CV-03830-RFL, 2024 WL 1090012, at *2 (N.D. Cal. Feb. 2, 2024) (finding cannabis cultivation is criminal without engaging in analysis); *with Cabazon*, 480 U.S. at 208–11 (bingo statutes are regulatory); *Colville*, 938 F.2d at 148 (traffic laws prohibiting speeding are regulatory); *In re Sonoma Cnty. Fire Chief's Application for an Inspection Warrant*, 228 F. App'x 671, 672 (9th Cir. 2007) (building codes, including fire codes, are regulatory); *Doe*, 415 F.3d at 1056 (child dependency proceedings are not criminal); *United States v. Best*, 573 F.2d 1095, 1100 (9th Cir. 1978) (suspension of driver's license is a regulatory, not criminal, penalty); *Burgess v. Watters*, 467 F.3d 676, 684–86 (7th Cir. 2006) (involuntary commitment statute is not criminal under PL 280); *U.S. v. Duro*, No. EDCV 07-1309 SGL (JCRX), 2009 WL 10669404, at *12–15

1    (C.D. Cal. Apr. 1, 2009) (California's nuisance laws are regulatory); *Twenty-Nine Palms Band of*

2    *Mission Indians v. Wilson*, 925 F. Supp. 1470 (C.D. Cal. 1996) (boxing laws are

3    regulatory), *vacated as preempted by statute*, 156 F.3d 1239 (9th Cir. 1998).

4              The medical exception for some of the limitations on cannabis possession and cultivation

5    does not render the statutes regulatory in nature. The strict limits on cultivation and possession are

6    not applicable to persons who cultivate or possess cannabis for "the personal medical purposes of

7    the patient upon the written or oral recommendation or approval of a physician." Cal. Health &

8    Saf. Code § 11362.5(d). This is a narrow exception to limits on possession and cultivation that

9    does not undermine the public policy of eradicating illegal marijuana operations. Moreover, the

10   medical use exemption does not provide protection from search or arrest based on suspected

11   violations of the laws limiting cultivation and possession, only an affirmative defense to

12   prosecution. *People v. Mower*, 49 P.3d 1067, 1073–74 (Cal. 2002). California courts have even

13   found that police officers do not have a duty to investigate whether a person has a valid medical

14   excuse when obtaining and executing search warrants related to illegal cannabis possession and

15   cultivation, and that the number of plants alone may sometimes be enough to constitute probable

16   cause even when a person claims a medical exemption. *People v. Clark*, 178 Cal. Rptr. 3d 649,

17   656 (Cal. Ct. App. 2014) ("that act cannot be interpreted to impose an affirmative duty on

18   law enforcement officers to investigate a suspect's status as a qualified patient or primary

19   caregiver under the act prior to seeking a search warrant."); *Littlefield v. Cnty. of Humboldt*, 159

20   Cal. Rptr. 3d 731, 739 (Cal. Ct. App. 2013) ("Here, the sheer quantity of marijuana under

21   cultivation could lead a reasonably prudent officer to conclude that plaintiffs' production far

22   exceeded their medical needs."); *Oceanside Organics v. Cnty. of San Diego*, 341 F. Supp. 3d

23   1129, 1143 (S.D. Cal. 2018) ("Accepting as true Plaintiffs' argument that they are qualified

24   patients, Defendants may have had probable cause to arrest Plaintiffs Sneller and Smith based on

25   the totality of circumstances at the time of the raid, including the number of marijuana plants at the

26   collective."). As in *Quechan*, the existence of this very limited exception does not change the

27

28

character of the entire scheme.[15] 984 F.2d at 307. As such, the court finds that California statutes governing cannabis cultivation and possession for sale are criminal and may be enforced by the state on the Reservation pursuant to PL 280. *Cabazon*, 480 U.S. at 207 (holding that a law which generally prohibits certain conduct may be enforced by a state under PL 280 against individual Indians on reservations).

When the state has jurisdiction to enforce a criminal law on a reservation, inherent tribal sovereignty does not prevent state law enforcement from investigating and prosecuting those laws. *See Inyo Cnty. v. Paiute-Shoshone Indians of the Bishop Cmty. of the Bishop Colony*, 538 U.S. 701 (2003). Because the court finds that Defendants have jurisdiction under PL 280 to enforce California law prohibiting possession of cannabis for sale and most marijuana cultivation on the Reservation, the court **GRANTS** Mendocino Defendants' Motion to Dismiss as to the First and Second Claims and **DISMISSES** the First and Second Claims with prejudice, as well as any elements of other claims that rely on the contention that the underlying searches were illegal because Defendants lacked enforcement jurisdiction.

## STANDING AND PRIVATE RIGHT OF ACTION

### *Third and Seventh Claims – The Tribe's Standing to Bring Claims under § 1983*

Mendocino Defendants move to dismiss Plaintiffs' Third and Seventh Claims based on the claim that the Tribe is not a person, citing to *Inyo County v. Paiute-Shoshone Indians of the Bishop Cmty. of the Bishop Colony*, 538 U.S. 701, 704 (2003), and thus lacks standing to bring the

---

[15] The court notes that many of the provisions in the Tribe's Compassionate Use Ordinance are the type of local land-use regulation that is expressly permitted by California state law and can exist alongside state criminal law. *See, e.g.*, *Granny Purps, Inc. v. Cnty. of Santa Cruz*, 266 Cal. Rptr. 3d 752, 757 (Cal. Ct. App. 2020) ("Significantly, California laws allowing access to medical marijuana do not limit the ability of a local government to make land use decisions"). However, compliance with local ordinances does not alter the probable cause analysis for search and arrest related to marijuana violations. *See Stewart v. Morris*, No. 10-CV-04106-NJV, 2013 WL 5268977, at *7 n.10 (N.D. Cal. Sept. 17, 2013) ("A DNC Ordinance in effect at the time allowed medical marijuana patients to grow up to 99 plants in a 100 square-foot canopy. Plaintiffs contend they were in compliance with the ordinance; Defendants contend that Plaintiffs exceeded the number of plants allowed in the square footage of the gardens they were cultivating. Whether Plaintiffs were in compliance with the DNC Ordinance does not affect the probable cause analysis.").

Third and Seventh Claims against Defendants.[16]

Defendants rely principally upon *Inyo County.* There, a tribe challenged the county's authority to seize casino employee records as part of a welfare fraud investigation. The tribe sought relief under § 1983, claiming that the county had violated its Fourth and Fourteenth Amendment rights and its right to self-government. The Supreme Court rejected the claim, holding that the tribe was not a "person" for purposes of § 1983. *Id.* at 711.[17] Specifically, it held that the tribe's assertion of sovereign immunity did not fall within § 1983's purpose of securing private rights against government encroachment. *Inyo,* 538 U.S. at 712; *cf. id.* at 714 (Stevens, J., concurring) ("the Tribe rests its case entirely on its claim that, as a sovereign, it should be accorded a special immunity that private casinos do not enjoy"). In other words, an Indian tribe "may not sue under § 1983 to vindicate [a] sovereign right," such as its right to be free of state regulation and control. *Inyo Cnty.*, 538 U.S. at 712; *see also Chemehuevi Indian Tribe v. McMahon*, 934 F.3d 1076, 1082 (9th Cir. 2019) (finding that the tribe had no § 1983 claim in Fourth Amendment case while individual plaintiffs' claims under § 1983 could proceed). However, tribes can sue in a capacity resembling a private person to vindicate private rights. *Skokomish Indian Tribe v. United States,* 410 F.3d 506, 514 (9th Cir. 2005) (citing to the examples in *Inyo* wherein sovereigns were purchasers and thus acted like "persons" who were allowed to sue under the Sherman Act and antitrust laws). Communal rights, like those reserved to a tribe and its members via treaty, also cannot be the basis of a § 1983 claim brought by either a tribe or individual tribe members. *Id.* at 514–15.

Here, based on the face of the FAC, the court does not read Plaintiffs' Third Claim to be brought by the Tribe at all—given the FAC's failure to reference the Tribe in any meaningful way under this cause of action—and instead reads this claim to be brought by Individual Plaintiffs only. Indeed, the FAC provides that "*Individual Plaintiffs* seek damages against the Defendants

---

[16] "[T]hose who seek to invoke the jurisdiction of the federal courts must satisfy the threshhold requirement imposed by Article III of the Constitution by alleging an actual case or controversy." *Maya v. Centex Corp.*, 658 F.3d 1060, 1067 (9th Cir. 2011) (citing *City of Los Angeles v. Lyons*, 461 U.S. 95, 101 (1983)).

[17] Section 1983 allows any "person" to sue for the "deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983.

United States District Court
Northern District of California

for violations of their rights under the Fourth Amendment to the United States Constitution, the California Constitution, state law and 42 U.S.C. § 1983 after Defendants' unlawful searches, seizures and destruction of the Individual Plaintiffs' property." (FAC ¶ 7) (emphasis added). The only mentions of the Tribe within the Third Claim are contained within paragraphs 98 and 102, with paragraph 102 being an assertion that there is no complete remedy at law and that declaratory and injunctive relief are necessary. (Dkt. 35 at 24–25.) As to paragraph 98, the FAC reports that the searches Defendants conducted infringed on "the Tribe's sovereignty and right to self-governance." (*Id.* at 24.) However, the basis for the injunctive relief requested pursuant to the Tribe's sovereignty and right to be free of state regulation has been rejected by the court as described above. Moreover, in their response, Plaintiffs do not address the Tribe's standing with respect to the Third Claim and instead reference this argument with respect to the Seventh Claim only. (*See* Dkt. 48 at 27–28.) Thus, the Motion to Dismiss Plaintiffs' Third Claim as brought by the Tribe is **DENIED** as moot.[18]

With respect to the Seventh Claim, which is brought under § 1983 based on the alleged violation of Plaintiffs' Fourteenth Amendment equal protection rights, the Tribe is not attempting to assert a sovereign or communal right. *Muscogee (Creek) Nation v. Okla. Tax Comm'n*, 611 F.3d 1222, 1234 (10th Cir. 2010). In fact, quite the opposite. There is "nothing uniquely sovereign about the Tribe's interest . . . [in] seeking to protect its rights against alleged unlawful discrimination or deprivation of due process of law." *Ute Indian Tribe of Uintah & Ouray Indian Rsrv. v. Ure*, 737 F. Supp. 3d 1183, 1201 (D. Utah 2024) (finding that the tribe had standing to sue under § 1983). Here, the FAC does just that. The FAC asserts that Defendants' selective enforcement of the laws involved discrimination against Plaintiffs "based on their race" and asserts the protections that Plaintiffs have as citizens and "residents" of California—rights that all citizens of California enjoy. (Dkt. 35 at 27–28.) An individual could similarly bring a claim on this

---

[18] To the extent that the FAC could be interpreted as the Tribe also bringing the Third Claim under § 1983, the Tribe would be seeking to enforce a right that exists only by virtue of its status as a sovereign, running afoul of the directives in *Inyo*. (FAC ¶ 98 ("Defendants . . . knowingly disregarded Public Law 280 and the Plaintiff Tribe's sovereignty and right to self-governance.")); *see Inyo Cnty.*, 538 U.S. at 711 (rejecting tribe's § 1983 claim where it was "only by virtue of the Tribe's asserted 'sovereign' status" that its rights were allegedly violated).

1  anti-discrimination basis. Thus, with respect to the Seventh Claim, the Tribe qualifies as a

2  "person" who can bring this claim under § 1983, and the Motion to Dismiss the Seventh Claim on

3  this basis is **DENIED**.

4  *Fourth Claim (Private Right of Action)*

5        Mendocino Defendants argue that the Fourth Claim for relief must be dismissed because

6  Article I § 13 of the California Constitution does not create a private right of action for monetary

7  damages. Drawing on this interpretation of the law, Defendants argue that Plaintiffs cannot bring

8  this claim based on the cited constitutional article alone. Plaintiffs' response, however, clarifies

9  that they based this claim "on recognized statutory tort theories, not an implied constitutional tort"

10  and that their claims for common law torts including false imprisonment, trespass, and conversion

11  fit "squarely" within Government Code § 815.2 and § 820 (and not Article I § 13 of the California

12  Constitution). (Dkt. 48 at 14–15.) While the allegations in the FAC might support these underlying

13  torts, the tort elements are not pleaded as required. *Bearden v. Alameda Cnty.*, No. 19-CV-04264-

14  SI, 2020 WL 1503656, at *4 (N.D. Cal. Mar. 30, 2020) (dismissing tort claim brought under §

15  815.2 without prejudice given failure to allege facts supporting a tort injury underlying the § 815.2

16  claim). Accordingly, Mendocino Defendants' Motion to Dismiss is **GRANTED** as to the Fourth

17  Claim. Plaintiffs are granted leave to amend to plead a specific tort injury or injuries.

18  **CLAIMS AGAINST SHERIFF KENDALL[19]**

19  *Third and Seventh Claims – Sheriff Kendall in His Official Capacity as A Redundant Defendant*

20        In Section VIII of their Motion to Dismiss, Mendocino Defendants move to dismiss the

21  Third and Seventh Claims against Sheriff Kendall in his official capacity on the grounds that he is

22  a redundant defendant, noting that Plaintiffs' claims in the FAC are against Sheriff Kendall in both

23  his official and individual capacities. (Def.'s Mot., Dkt. 40, at 18 (citing *Mendiola-Martinez v.*

24  *Arpaio,* 836 F.3d 1239 (9th Cir. 2016) and *Ctr. for Bio–Ethical Reform v. L.A. Cty. Sheriff Dep't*,

25  533 F.3d 780, 786 (9th Cir. 2008))). Plaintiffs argue that he is not redundant in his official

26  capacity because he is the person with operational control who would implement any injunctive

27

28  [19] This section addresses Mendocino Defendants' Motion to Dismiss sections VIII, X, and XI, all of which seek to dismiss claims against Sheriff Kendall.

United States District Court
Northern District of California

1  relief. (Pls.' Resp., Dkt. 48, at 15–17.)

2          Plaintiffs are correct in that if the court were to grant injunctive relief, these claims against

3  Sheriff Kendall may not be redundant to the extent that he, and not the County, is the official in

4  charge of carrying out injunctive or declaratory relief awarded to Plaintiffs. *See Hartmann v. Cal.*

5  *Dep't of Corr. & Rehab.*, 707 F.3d 1114, 1127 (9th Cir. 2013) ("A plaintiff seeking injunctive

6  relief against the State . . .[should] name the official within the entity who can appropriately

7  respond to injunctive relief."); *Roy v. Cnty. of Los Angeles*, 114 F. Supp. 3d 1030, 1047 (C.D. Cal.

8  2015) (finding that sheriff named in his official capacity was not a redundant defendant where the

9  complaint named the sheriff and the county but not the sheriff's department). Plaintiffs seek

10  injunctive relief as to the Seventh Claim. (FAC at 28 (Prayer for Relief requesting the court "issue

11  declaratory and injunctive relief . . . requiring Defendant Kendall and Mendocino County enforce

12  State criminal law and serve and protect Indians on the Reservation").) Accordingly, Sheriff

13  Kendall in his official capacity is not a redundant Defendant, and the Motion to Dismiss the Third

14  and Seventh Claims against him on this basis is **DENIED**.

15  *Third Claim (Fourth Amendment) Against Sheriff Kendall in his Individual Capacity*

16          In Section X of their Motion to Dismiss, Mendocino Defendants argue that Plaintiffs'

17  Third Claim for relief should be dismissed against Sheriff Kendall in his individual capacity

18  because there are no facts pled establishing that he was personally involved in the alleged § 1983

19  violations. (Dkt. 40 at 20.) Mendocino Defendants cite to *Barren v. Harrington*, 152 F.3d 1193,

20  1194 (9th Cir. 1998) for the proposition that "[a] plaintiff must allege facts, not simply

21  conclusions, that show that an individual was personally involved in the deprivation of his civil

22  rights," to support their argument that Sheriff Kendall should be dismissed in his individual

23  capacity. Mendocino Defendants further cite to *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989)

24  for the proposition that there is no respondeat superior liability under § 1983 and for the

25  proposition that "[a] supervisor is only liable for constitutional violations of his subordinates if the

26  supervisor participated in or directed the violations, or knew of the violations and failed to act to

27  prevent them." (*Id.;* Dkt. 40 at 32.)

28          In opposition, Plaintiffs argue that the FAC properly alleges that Sheriff Kendall

"personally ordered, authorized, and orchestrated the raids on tribal trust land" and that Sheriff Kendall's liability "is not premised on respondeat superior, but on his own conduct in setting the raids in motion and endorsing their execution," citing to *Barren*. (Dkt. 48 at 21.) Plaintiffs further argue that the FAC states a valid supervisory liability claim against Sheriff Kendall given his leadership role in the alleged operations. (*Id.* at 21–22.)

"Although there is no pure *respondeat superior* liability under § 1983, a supervisor is liable for the acts of his subordinates 'if the supervisor participated in or directed the violations, or knew of the violations [of subordinates] and failed to act to prevent them.'" *Preschooler II v. Clark Cnty. Sch. Bd. of Trustees,* 479 F.3d 1175, 1182 (9th Cir. 2007) (quoting *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir.1989)). A supervisor may be held liable for (1) his "own culpable action or inaction in the training, supervision, or control of his subordinates," (2) his "acquiescence in the constitutional deprivations of which the complaint is made," or (3) conduct that showed a "reckless or callous indifference to the rights of others." *Larez v. City of Los Angeles*, 946 F.2d 630 (9th Cir. 1991) (internal citations omitted); *see also Bedford v. City of Hayward*, No. 3:12-CV-00294-JCS, 2012 WL 4901434, at *10 (N.D. Cal. Oct. 15, 2012) (finding Plaintiff's allegations sufficient to state a claim of supervisor liability on the part of defendant law enforcement officers—all of whom were supervisors of the three officers who allegedly unlawfully detained plaintiff); *Sandoval v. Cnty. of Sonoma*, No. 11-CV-05817-TEH, 2015 WL 678519, at *2 (N.D. Cal. Feb. 17, 2015); *Starr v. Baca*, 652 F.3d 1202 (9th Cir. 2011).

Here, Plaintiffs allege that, in his individual capacity, Sheriff Kendall was responsible for their constitutional deprivations because he directed and approved, or knew of and failed to stop, the raids of Individual Plaintiffs' properties described in detail in the FAC (as well as other past and future cannabis raids discussed in the FAC). (*See, e.g.,* Dkt. 35 at 2–5, 17–20, 24–28, Ex. H). While there is no evidence of Sheriff Kendall's direct participation in the raids themselves, the allegations that he "intentionally directed, approved and authorized, or knew or should have known" about the alleged improper searches described in the FAC, as well as the allegations that he failed to train his deputies to prevent invalid search warrants and his public statements about his collaboration with other sheriffs in conducting cannabis operations, are sufficient at this

1    juncture to state a § 1983 claim against him. Accordingly, Defendants' Motion to Dismiss the

2    Third Claim as to Sheriff Kendall in his individual capacity is **DENIED**.

3    *Fifth Claim (Bane Act) Against Sheriff Kendall in his Individual Capacity*

4        In Section XI of their Motion to Dismiss, Mendocino Defendants argue that Plaintiffs'

5    Fifth Claim for relief should be dismissed against Sheriff Kendall in his individual capacity

6    because Plaintiffs fail to state facts sufficient to constitute a claim for relief. (Dkt. 40 at 33–35.)

7    Defendants argue that the FAC fails to allege facts pointing to "any personal involvement or

8    participation" in "either obtaining or executing the warrants at issue" or to "what particular acts or

9    omissions of Sheriff Kendall allegedly caused Plaintiffs' claimed injuries," in violation of the

10   pleading standard set by Government Code § 951.[20] (*Id.* at 34; *see also* Dkt. 48 at 22.) Defendants

11   further argue that the FAC fails to meet the standards required for a Bane Act claim brought under

12   California Civil Code § 52.1. (Dkt. 48 at 22.)

13       Plaintiffs in opposition provide that, under any pleading standard, the FAC properly

14   alleges that Sheriff Kendall helped coordinate and direct the raids and supervised the deputies

15   involved in the raids, linking him to the searches, seizures, and property destruction at issue here,

16   through either supervisory authority or direct involvement. (Dkt. 48 at 22.)

17       Defendants first argue that California Government Code § 820.8 precludes Sheriff

18   Kendall's liability under the Bane Act, citing to *Milton v. Nelson*, 527 F.2d 1158 (9th Cir. 1975).

19   In opposition, Plaintiffs argue that § 820.8 bars vicarious liability for injuries caused solely by

20   another's conduct but does not shield a public employee from liability for his own acts or

21   omissions. (Dkt. 48 at 30.) Plaintiffs further argue that the facts alleged (including that Sheriff

22   Kendall personally authorized, directed, or knowingly permitted the unlawful raid, and that his

23   negligence contributed to the resulting constitutional and statutory violations) are sufficient to

24

25   ─────────────

26   [20] This is a California state, and not federal, pleading rule, as Plaintiffs point out in their opposition.
     Defendants do not provide any argument as to why the state pleading rule should apply in this case. The court
     finds that Government Code § 951 does not change the pleading standards here and only Rule 8 applies.

27   *DeShazier v. Williams*, No. F06-0591 AWISMS, 2006 WL 2522397, at *6 (E.D. Cal. Aug. 29, 2006)
     ("Plaintiff correctly contends the complaint need conform only to the notice pleading standard set forth in
     Rule 8 of the Federal Rules of Civil Procedure; there is no requirement that claims for relief be plead with

28   particularity where municipal liability is alleged.").

state a claim for personal involvement, which § 820.8 does not preclude, and which is enough to state a claim under the Bane Act and for negligence. (*Id.*)

The Bane Act "provides that a person may bring a cause of action 'in his or her own name and on his or her own behalf' against anyone who 'interferes by threats, intimidation or coercion,' with the exercise or enjoyment of any constitutional or statutory right." *Bay Area Rapid Transit Dist. v. Superior Ct.*, 44 Cal. Rptr. 2d 887, 887 (Cal. Ct. App. 1995) (quoting Cal. Civ. Code § 52.1). California Government Code Section 820.8 provides, "a public employee is not liable for an injury caused by the act or omission of another person." Cal. Gov't Code § 820.8. A public employee may be liable, however, "for injury proximately caused by his own negligent or wrongful act or omission." *Id.* Thus, § 820.8 immunizes an individual from vicarious liability but does not provide immunity for direct supervisory actions. *Turano v. Cnty. of Alameda*, No. 17-CV-06953-KAW, 2019 WL 501479, at *4 (N.D. Cal. Feb. 8, 2019) (internal citations omitted). The district court in *Turano v. Cnty. of Alameda,* No. 17-CV-06953-KAW, 2019 WL 501479, at *4 (N.D. Cal. Feb. 8, 2019), summarized:

> In *Johnson v. Baca*, the district court found that § 820.8 immunity did not apply where the plaintiff sought to hold a sheriff liable based on his failure to implement adequate policies and sufficiently train staff to avoid violation of inmates' rights. Case No. CV 13-4496 MMM (AJWx), 2014 WL 12588641, at *17 (C.D. Cal. Mar. 3, 2014). In other words, the plaintiff sought to hold the defendant "personally liable for his conduct as a supervisor." *Id.; see also Doe v. Regents of Univ. of Cal*., No. CIV. S-06-1043 LKK/DAD, 2006 WL 2506670, at *5 (E.D. Cal. Aug. 29, 2006) (denying motion to dismiss on § 820.8 immunity grounds where the plaintiffs' theory of liability was based on the defendant's direct actions as a supervisor); *Phillips v. Cty. of Fresno*, No. 1:13-cv-538 AWI BAM, 2013 WL 6243278, at *13 (E.D. Cal. Dec. 3, 2013) ("Plaintiffs' complaint . . . allege[s] the direct participation of the supervisory Defendants in Plaintiffs' harms based on the failure to carry out various managerial functions to prevent the harm, including adequate discipline, training, supervision and the failure to promulgate appropriate policies. Thus there is no apparent applicability of section 820.8."); *Staten v. Calderon*, No. F052046, 2008 WL 4446526, at *8 (Cal. Ct. App. Oct. 3, 2008) ("the immunity provided by section 820.8 does not extend to claims of negligent training and supervision").

Moreover, courts have held that Bane Act claims against sheriffs can be based on supervisory conduct and respondeat superior liability. *See, e.g., Johnson v. Baca*, No. 13-cv-04496-MMM-AJWx, 2014 WL 12588641, at *16 (C.D. Cal. Mar. 3, 2014) (holding that a Bane Act claim can be

28

1   asserted against a sheriff on the basis of supervisory conduct); *see also Neuroth v. Mendocino*

2   *County*, No. 15-cv-03226-NJV, 2016 WL 379806, at *7 (N.D. Cal. Jan. 29, 2016); *see also M.H.*

3   *v. Cnty. of Alameda,* No. 11–CV–02868 JST, 2013 WL 1701591, *6 (N.D.Cal. Apr. 18, 2013)

4   (recognizing availability of respondeat superior liability for violations of Bane Act); *see also*

5   *Martinez v. Cnty. of Sonoma*, No. 15-CV-01953-JST, 2015 WL 5354071, at *10 (N.D. Cal. Sept.

6   14, 2015) (same).

7           Here, Plaintiffs allege both that Sheriff Kendall had supervisory authority over the deputies

8   involved in the raids and that he directly took part in planning the operations. For example,

9   Plaintiffs allege that Sheriff Kendall publicly endorsed the raids and pledged to continue similar

10  actions through his social media posts covering the raids (*see, e.g.,* Ex. F), as well as that he

11  directed and coordinated the raids (*see, e.g.,* Dkt. 35 at 17, 24, 26), and that his negligence

12  contributed to the destruction of Plaintiffs' property and violation of their constitutional rights. *Id.*

13  at 27. His liability is therefore premised on his direct supervisory involvement and not vicarious

14  liability, and § 820.8 does not grant Sheriff Kendall immunity here. At this stage, these allegations

15  signal intent on the part of Sheriff Kendall to deprive Individual Plaintiffs of their constitutional

16  rights. Thus, Plaintiffs have sufficiently pled a claim against Sheriff Kendall in his individual

17  capacity under the Bane Act. Accordingly, the Defendants' Motion to Dismiss on this ground is

18  **DENIED**.

19  ### *Sixth Claim (Negligence) Against Sheriff Kendall in his Individual Capacity*

20          Mendocino Defendants first argue that California Government Code § 821.6 immunizes

21  Sheriff Kendall from the Sixth Claim for negligence related to the destruction of Plaintiffs'

22  property during the execution of the search warrant on Plaintiffs' property, because the searches

23  were part of a "judicial or administrative proceeding." Cal. Gov't Code § 821.6. In opposition,

24  Plaintiffs argue that the FAC gives Kendall "fair notice" of the claims brought against him (dkt. 48

25  at 24) and that Government Code § 821.6 does not immunize Sheriff Kendall's conduct here,

26  citing to *Leon v. County of Riverside*, 530 P.3d 1093, 1101 (Cal. 2023). (Dkt. 48 at 23.)

27          Section 821.6 states, "[a] public employee is not liable for injury caused by his instituting

28  or prosecuting any judicial or administrative proceeding within the scope of his employment, even

United States District Court
Northern District of California

1    if he acts maliciously and without probable cause." The California Supreme Court recently

2    clarified that § 821.6 "immunizes public employees from claims of injury caused by wrongful

3    prosecution" but does not "confer[ ] immunity from claims based on other injuries inflicted in the

4    course of law enforcement investigations." *Leon v. Cnty. of Riverside*, 530 P.3d 1093, 1096 (Cal.

5    2023). The *Leon* court explained that § 821.6 immunity "is narrow in the sense that it applies only

6    if the conduct that allegedly caused the plaintiff's injuries was the institution or prosecution of an

7    official proceeding," but is "broad in the sense that it applies to every such tort claim, whether

8    formally labeled as a claim for malicious prosecution or not." *Id.* at 1100–01. The California

9    Supreme Court explicitly disapproved of prior appellate court opinions extending § 821.6

10   immunity to "acts that are merely investigatory and unconnected to the prosecution of any official

11   proceeding," including at least two cases concerning officer conduct during the execution of a

12   search warrant and seizure of property. *Leon*, 530 P.3d at 1103, 1106 (disapproving of *Cnty. of

13   Los Angeles v. Superior Ct.*, 104 Cal. Rptr. 3d 230 (2009), *as modified* (Jan. 22, 2010), and

14   *Baughman v. State of Cal.*, 45 Cal. Rptr. 2d 82 (1995)).

15        Defendants' argument about § 821.6 immunity cites to only one pre-*Leon* case and makes

16   no argument as to how Sheriff Kendall's alleged conduct is connected to the prosecution of an

17   official proceeding. Indeed, multiple federal district courts have applied *Leon* to find that § 821.6

18   immunity does not extend to actions taken by officials during investigatory searches. *Agro

19   Dynamics, LLC v. United States*, 692 F. Supp. 3d 1003, 1018 (S.D. Cal. 2023) (holding that

20   immunity does not apply to execution of search warrant); *Gatt v. Gascon*, No. 2:24-CV-02740-

21   FLA (AGRX), 2025 WL 4058861, at *9–10 (C.D. Cal. Sept. 5, 2025) ("Plaintiff's state law claims

22   against the City Defendants are based in part on alleged injuries separate from and unrelated to the

23   initiation or prosecution of an official proceeding, including from his arrest and detention [and] the

24   search of his home and seizure of his property"). Given that the injuries in this case arose from

25   investigatory conduct unrelated to an official proceeding, and that Defendants have provided no

26   argument to the contrary, Plaintiffs' negligence claim against Sheriff Kendall is not barred by §

27   821.6 immunity.

28        Mendocino Defendants further argue that Plaintiffs' Sixth Claim for negligence should be

1  dismissed against Sheriff Kendall in his individual capacity because they fail to state facts

2  sufficient to constitute a claim for relief. (Dkt. 40 at 33–35.) Defendants argue that "required

3  particularized allegations" required under California Government Code § 951 are absent. (*Id.*)

4         Plaintiffs in opposition argue that they need only provide "a short and plain statement of

5  the claim" sufficient to allow a reasonable inference of liability under Rule 8(a)(2) and the *Iqbal*

6  standard and that the FAC meets this liberal notice-pleading requirement. Specifically, Plaintiffs

7  allege that the FAC names Sheriff Kendall, identifies him as the official responsible for the raid,

8  alleges he publicly endorsed it and pledged to continue similar actions, (Dkt. 35 at 17–20, 24–28,

9  Ex. H), and pleads that his negligence contributed to the destruction of Plaintiffs' property and

10 violation of their rights. *Id.* at 27. Plaintiffs allege that these facts, combined with the detailed

11 description of the raids conducted under Sheriff Kendall's authority, "plausibly support individual

12 liability as a direct participant or one deliberately indifferent to constitutional violations" sufficient

13 to establish a negligence claim against Sheriff Kendall in his individual capacity. (Dkt. 48 at 29.)

14        In California, an adequately pleaded claim for negligence requires (1) a legal duty to use

15 reasonable care; (2) breach of that duty; and (3) proximate cause between the breach and (4) the

16 plaintiff's injury. *Mendoza v. City of Los Angeles*, 78 Cal. Rptr. 2d 525 (1998) (internal citations

17 omitted); *see also Melton v. Boustred*, 107 Cal. Rptr. 3d 481, 488 (Cal. Ct. App. 2010) ("The

18 elements of a cause of action for negligence are duty, breach, causation, and damages.").

19        As a threshold matter, "it is the Federal Rules of Civil Procedure that is applicable to

20 pleading requirements in federal court." *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 513 (2002)

21 ("Rule 8(a)'s simplified pleading standard applies to all civil actions, with limited exceptions" like

22 Rule 9(b)'s requirement of greater particularity for claims of fraud or mistake); *see also Newman*

23 *v. Cnty. of Los Angeles*, No. CV062748RSWLSHX, 2006 WL 8436529, at *1 (C.D. Cal. Dec. 11,

24 2006). As noted above, Government Code § 951 does not apply to change the pleading standards

25 here. *DeShazier*, No. F06-0591 AWISMS, 2006 WL 2522397, at *6 ("Plaintiff correctly contends

26 the complaint need conform only to the notice pleading standard set forth in Rule 8 of the Federal

27 Rules of Civil Procedure; there is no requirement that claims for relief be plead with particularity

28 where municipal liability is alleged.").

United States District Court
Northern District of California

1    At this juncture, the court finds that the FAC sufficiently pleads a negligence claim as to

2    Sheriff Kendall. The FAC alleges a duty of care, breach, and damages, as well as facts to support

3    Sheriff Kendall's involvement in the raids beyond merely stating his role as a supervisor, and

4    detailed descriptions of the raids themselves. (*See, e.g.,* Dkt. 35 at 2–5, 17–20, 24–28, Ex. H.); *Cf.*

5    *Schmitz v. Asman*, No. 220CV00195JAMCKDPS, 2020 WL 6728226, at *19 (E.D. Cal. Nov. 16,

6    2020), *report and recommendation adopted*, No. 220CV00195JAMCKDPS, 2020 WL 7624963

7    (E.D. Cal. Dec. 22, 2020) ("Plaintiffs must do more than simply assert that these defendants held

8    leadership roles during the time that Decedent received less than the constitutional standard of

9    medical care."). Thus, Mendocino Defendants' Motion to Dismiss the Sixth Claim against Sheriff

10   Kendall in his individual capacity is **DENIED**.

11   **CLAIMS AGAINST DEFENDANT MENDOCINO COUNTY[21]**

12   <u>*Third and Seventh Claims Against Defendant Mendocino County* – Monell *Liability*</u>

13   Plaintiffs' Third and Seventh Claims for relief both involve Defendants' liability under §

14   1983. Defendants argue that Mendocino County is not liable under § 1983 because Plaintiffs fail

15   to show a "direct causal link" between their alleged custom or policy and the constitutional

16   violation, citing to *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 415 (1997),

17   which provides that "Congress did not intend municipalities to be held liable unless deliberate

18   action attributable to the municipality directly caused a deprivation of federal rights." *Id.*

19   Defendants further provide that Plaintiffs' Third and Seventh Claims "contain no allegations

20   whatsoever" establishing any of the grounds for liability under § 1983.

21   In *Monell*, the Supreme Court held that "a municipality cannot be held liable under § 1983

22   on a *respondeat superior* theory." *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 691

23   (1978). Instead, municipal liability may be established in three ways: "(1) the constitutional

24   violation was the result of a governmental policy or a longstanding practice or custom; (2) the

25   individual who committed the constitutional violation was an official with final policy-making

26   authority; or (3) an official with final policy-making authority ratified the unconstitutional act."

27

28   [21] This section of the Order addresses Mendocino Defendants' Motion to Dismiss sections IX and XII, both of which seek to dismiss claims against Defendant Mendocino County.

United States District Court
Northern District of California

*Perryman v. City of Pittsburg*, 545 F. Supp. 3d 796, 799 (N.D. Cal. 2021) (citing *Gillette v. Delmore*, 979 F.2d 1342, 1346- 47 (9th Cir. 1992)). The Ninth Circuit has made clear that *Monell* claims "may not simply recite the elements of a cause of action but must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively." *AE ex rel. Hernandez v. Cnty. of Tulare*, 666 F.3d 631, 637 (9th Cir. 2012).

Plaintiffs appear to allege that Defendant Mendocino County should be liable for the alleged constitutional deprivations both on the basis of their failure to properly train deputies (dkt. 35 at 19) as well as on the basis of ratification by a final policy-making authority. (*Id.* at 17–20, 24.) Defendants argue that Plaintiffs fail to state a claim under any theory. For the reasons discussed below, Plaintiffs' Third and Seventh Claims state a claim against Defendant Mendocino County under *Monell* on the basis of ratification.

To show liability based on ratification, a plaintiff must prove that the "authorized policymakers approve a subordinate's decision and the basis for it." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 105 (1988). The policymaker must have knowledge of the constitutional violation and actually approve of it. A mere failure to overrule a subordinate's actions, without more, is insufficient to support a *Monell* claim. *Lytle v. Carl*, 382 F.3d 978, 987 (9th Cir. 2004); *Gillette v. Delmore*, 979 F.2d 1342, 1348 (9th Cir. 1992) (rejecting *Monell* liability where city manager failed to overrule a subordinate's disciplinary decision, holding that failure to overrule without more does not amount to ratification and cautioning that such a theory would improperly reintroduce respondeat superior into § 1983 jurisprudence); *see also James v. Cnty. of San Bernardino*, No. 5:25-CV-00140-WLH-SHK, 2025 WL 1674463, at *5 (C.D. Cal. May 9, 2025); *Sanders v. City of Nat'l City*, No. 20-CV-00085-AJB-BLM, 2020 WL 6361932, at *4 (S.D. Cal. Oct. 29, 2020); *see also Little v. Gore*, 148 F. Supp. 3d 936, 957 (S.D. Cal. 2015) (finding allegations sufficient to allege *Monell* claim where defendant "promulgated, adopted, ratified, and acquiesced to policies, procedures, and customs governing the disposition of evidence in marijuana investigations"); *Nelson*, No. CV 11-5407-PSG (JPR) at *8 (finding *Monell* liability against city on the basis of alleged ratification but denying *Monell* liability on other bases); *Cortez v. Cnty. of Los Angeles*, 294 F.3d 1186, 1187 (9th Cir. 2002) (finding that the Los Angeles County

Sheriff acts as the final policymaker for the County of Los Angeles in establishing and implementing policies and procedures for the safekeeping of inmates in the county jail).

Plaintiffs allege that Sheriff Kendall, acting as a final policymaker with responsibilities over Mendocino County's law enforcement customs and practices, ratified the deputies' conduct by coordinating and endorsing the raids—including publicly on social media. (FAC ¶¶ 65, 70–72, Ex. H). They further appear to assert that Sheriff Kendall's actions reflect a broader pattern of condoning unconstitutional practices within the Sheriff's Department. (FAC ¶ 62). While courts have held that a mere failure to overrule or discipline subordinates is insufficient to establish ratification, *Lytle*, 382 F.3d at 987, Plaintiffs here allege more than passive inaction. Specifically, they allege that Sheriff Kendall publicly endorsed the raids and affirmatively signed off on both the raids underlying this case and Mendocino County's broader program for marijuana enforcement.

Additionally, with respect to the Seventh Claim, Plaintiffs properly allege that Sheriff Kendall was the officer responsible for withholding law enforcement services on the Reservation in violation of Plaintiffs' constitutional rights. (FAC ¶¶ 9, 126.) At the pleading stage, these allegations plausibly support the inference that Sheriff Kendall made a conscious, affirmative decision to approve both the deputies' conduct and its legal basis. The Motion to Dismiss the § 1983 claims against the County is therefore **DENIED**. *James*, No. 5:25-CV-00140-WLH-SHK, 2025 WL 1674463, at *5.

*Fifth Claim (Bane Act) Against Defendant Mendocino County*

Defendants also argue that, as to Defendant Mendocino County[22], Plaintiffs' claim for relief for violation of the Bane Act fails because Civil Code § 52.1 does not provide for any claim against a public entity directly, citing to *Towery v. State of California*, 221 Cal. Rptr. 3d 692, 699 (2017), *as modified* (Aug. 14, 2017). (Dkt. 40 at 25.)  Plaintiffs contend in their response that Government Code § 815.2(a) "squarely provides" that public entities are vicariously liable for the torts of their employees committed within the scope of employment. (Dkt. 48 at 24.)

---

[22] The FAC includes Sheriff Kendall in his official capacity here, too, as the County is equivalent to Sheriff Kendall in his official capacity.

United States District Court
Northern District of California

Defendants' argument that the Bane Act does not provide for direct liability of public entities is irrelevant because the Bane Act claim against Mendocino County is not based on direct liability. The Fifth Claim explicitly pleads that the County is "vicariously liable" for the actions of Sheriff Kendall under Government Code § 815.2 and § 820. (FAC ¶ 111.) Courts have consistently allowed plaintiffs to bring Bane Act claims against public entities under theories of vicarious liability pursuant to Government Code § 815.2(a). *See, e.g.*, *Yaple v. Cnty. of Riverside*, No. 523CV01478ODWASX, 2024 WL 1257434, at *4 (C.D. Cal. Mar. 25, 2024) ("a government entity can be held vicariously liable for a Bane Act violation as an employer of the specific government employee"); *D.V. v. City of Sunnyvale*, 65 F. Supp. 3d 782, 787 (N.D. Cal. 2014) (collecting cases); *Towery*, 221 Cal.Rptr.3d at 697 ("Nor does Towery allege claims against a specific State employee or employees for which the State might be vicariously liable as an employer [under the Bane Act]."). Because Plaintiffs successfully stated a Bane Act claim against Sheriff Kendall in his individual capacity, they have also successfully alleged the County's vicarious liability. Accordingly, the court **DENIES** Defendants' Motion to Dismiss the Fifth Claim as against the County.

### Sixth Claim (Negligence) Against Defendant Mendocino County

Mendocino Defendants also seek dismissal of Plaintiffs' Sixth Claim for negligence on the ground that the FAC fails to properly plead compliance with the California Tort Claims Act ("CTCA"), under which all government tort liability must be based on statute, citing to Cal. Gov't Code § 815. (Dkt. 40 at 35–36.) Defendants argue that there is a heightened pleading standard for plaintiffs seeking tort damages from a California public entity and contend that Plaintiffs fail to cite a statutory basis for liability on the part of Defendant Mendocino County with respect to the negligence claim and fail to plead "every fact material to the existence of its statutory liability" with particularity. (Dkt. 40 at 35–36.)

The California Government Code provides that "a public entity is not liable for an injury," "[e]xcept as otherwise provided by statute." Cal. Gov't Code § 815. One of these statutory exceptions is Government Code § 815.2, which provides that "[a] public entity is liable for injury proximately caused by an act or omission of an employee of the public entity within the scope of

his employment if the act or omission would, apart from this section, have given rise to a cause of action against that employee or his personal representative," unless the employee themself is immune from liability. Cal. Gov't Code § 815.2. Section 815.2 is the statutory basis on which public entities may be held vicariously liable for the common-law tort actions of their employees. *See Societa Per Azioni De Navigazione Italia v. City of Los Angeles*, 645 P.2d 102, 112 (Cal. 1982) ("[T]he general rule is that an employee of a public entity is liable for his torts to the same extent as a private person (§ 820, subd. (a)) and the public entity is vicariously liable for any injury which its employee causes (§ 815.2, subd. (a)) to the same extent as a private employer (§ 815, subd. (b))."); *C.A. v. William S. Hart Union High Sch. Dist.*, 270 P.3d 699, 704 (Cal. 2012) ("Section 815.2, in turn, provides the statutory basis for liability relied on here [in bringing a negligence claim against a public entity]."). While Plaintiffs did not cite to § 815.2 under the negligence claim in the FAC, they specified that the County is "vicariously liable for the actions of Defendant Sheriffs and deputies," which is sufficient to invoke the statutory basis for the County's liability, particularly when considered in conjunction with the allegations elsewhere that connect § 815.2 and vicarious liability. (FAC ¶ 119.) Thus, because Plaintiffs may proceed with their negligence claim against Sheriff Kendall in his individual capacity, they may proceed against Defendant Mendocino County on a respondeat superior theory. *Smith v. Cnty. of Orange*, No. 8:23-CV-02426-DOC-KES, 2025 WL 3723748, at *11 (C.D. Cal. Dec. 12, 2025) ("Because Plaintiff may proceed with its negligence claim against . . . Dr. Do, it may proceed against the County on a respondeat superior theory"); *see also Laurel v. Cnty. of Alameda*, No. 24-CV-04427-RFL, 2025 WL 2402674, at *8 (N.D. Cal. Aug. 19, 2025) (denying motion to dismiss negligence claim against County). The County has not identified any other basis for immunity except those already considered by the court. Therefore, the Motion to Dismiss is **DENIED** as to the Sixth Claim against Defendant Mendocino County.

## DEFENDANT DURYEE'S MOTION TO DISMISS

In a separate Motion to Dismiss the FAC, Defendant Duryee (CHP Commissioner) argues that Plaintiffs' claims against him must be dismissed for failure to state a claim under Rule 12(b)(6). (Dkt. 46 at 17.) Specifically, Defendant Duryee moves to dismiss on the following

United States District Court
Northern District of California

United States District Court
Northern District of California

1   grounds: (1) Plaintiffs lack Article III standing to pursue prospective relief against Defendant

2   Duryee because CHP did not participate in the challenged search and poses no threat of future

3   enforcement; (2) Plaintiffs fail to state a claim upon which relief can be granted; (3) Plaintiffs

4   allege merely that Defendant Duryee is the Commissioner of the CHP but do not identify any

5   alleged duty or authority in connection with the actions taken in this matter, or any alleged

6   wrongful conduct—and Plaintiffs cannot legitimately invoke the *Ex parte Young* exception to

7   Defendant Duryee's Eleventh Amendment immunity; and (4) Plaintiffs cannot recover money

8   damages as to Commissioner Duryee because such claims are barred by the Eleventh Amendment.

9   (Dkt. 46 at 9.)

10          Because the court has dismissed the First Claim and Second Claim, only the Third Claim

11  remains against Defendant Duryee. Thus, the court analyzes Defendant Duryee's arguments as to

12  that Claim without reference to the theories and elements dismissed through the analysis above,

13  and the Motion to Dismiss as to the First and Second Claims is **DENIED** as moot. What remains

14  in the Third Claim is the § 1983 claim for violation of the Individual Plaintiffs' Fourth

15  Amendment rights through Defendants' illegal searches, seizures, and destruction of property.

16  Those claims are bolstered by factual allegations that, at least as to Swearinger, the CHP was

17  involved in the warrantless destruction of her property (in a disproportionate use of force). (FAC

18  ¶¶ 48–50.) The allegations are that she saw multiple CHP vehicles convoy with sheriff and Fish

19  and Game vehicles to the back of her property, then approximately 30 mins later the convoy left,

20  after which Plaintiff Swearinger discovered further property damage and destruction. (FAC ¶¶ 48–

21  50.) Certainly, the direct implication is enough to allege CHP involvement in the raid.

22  Furthermore, Plaintiffs allege that Duryee intentionally directed, approved and authorized, or

23  knew or should have known of the raids (and their illegality); that through his acts or omissions

24  maintained a custom, policy, and/or practice of committing warrantless (and otherwise illegal)

25  raids on the Reservation; and that he is responsible for managing, supervising, training,

26  disciplining, and directing the duties of all CHP employees, including officers. (*See, e.g.*, FAC ¶¶

27  63, 74, 98.)

28          These allegations, for the reasons stated above as to Sheriff Kendall, are sufficient to

maintain the Third Claim against Defendant Duryee in his individual capacity. However, because Plaintiffs' requests for prospective injunctive relief are tied to the now dismissed First and Second Claims, Defendant Duryee is entitled to dismissal in his official capacity as to the Third Claim pursuant to Eleventh Amendment Immunity. *See, e.g.*, *Porter v. Jones,* 319 F.3d 483, 491 (9th Cir. 2003) ("[Under the Eleventh Amendment,] suits against an official for prospective relief are generally cognizable, whereas claims for retrospective relief (such as damages) are not."); *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 268–69 (1997) ("Indian tribes, we therefore concluded, should be accorded the same status as foreign sovereigns, against whom States enjoy Eleventh Amendment immunity."). Accordingly, Defendant Duryee's Motion to Dismiss is **GRANTED** and Defendant Duryee is **DISMISSED** in his official capacity. This dismissal is without prejudice because Plaintiffs could possibly state a claim for prospective injunctive relief against Defendant Duryee in his official capacity insofar as it is not tied to, or based on, the theories expressed in the now dismissed First and Second Claims. *Flint v. Dennison*, 488 F.3d 816, 825 (9th Cir. 2007) ("When sued for prospective injunctive relief, a state official in his official capacity is considered a 'person' for § 1983 purposes.").

## CONCLUSION

For the foregoing reasons, Mendocino Defendants' Motion to Dismiss is **GRANTED IN PART AND DENIED IN PART**, and Defendant Duryee's Motion to Dismiss is **GRANTED IN PART AND DENIED IN PART**.

**IT IS SO ORDERED.**

Dated: January 29, 2026

ROBERT M. ILLMAN
United States Magistrate Judge